McGEE, Chief Judge.
*237 Kevin S. Williams ("Defendant") appeals from a domestic violence protective order ("DVPO") entered 4 August 2014. Defendant contends that the trial court erred by concluding (1) that Defendant and Caroline Anne Thomas ("Plaintiff") had a "dating relationship" and (2) that Defendant had committed acts of domestic violence against Plaintiff by repeatedly contacting Plaintiff after she ended their relationship, thereby placing Plaintiff in fear of continued harassment. We disagree.
I. Background
Plaintiff and Defendant met in early April 2014 on a greenway in Charlotte where Defendant regularly volunteered with the Charlotte-Mecklenburg Park and Recreation Department. Plaintiff and Defendant dated for less than three weeks. Plaintiff attempted to end her relationship with Defendant on 1 *902 May 2014 and asked Defendant to stop contacting her. However, Defendant continued to contact Plaintiff via phone calls, voicemails, and text messages. In response, Plaintiff filed a police report with the Charlotte-Mecklenburg Police Department on 17 May 2014. Detective Melissa Wright ("Detective Wright") spoke to Defendant on 23 May 2014 and directed Defendant to stop contacting Plaintiff. Defendant, however, continued to contact Plaintiff. *238 Plaintiff filed a verified complaint and motion for a domestic violence protective order on 30 May 2014 ("Plaintiff's verified complaint"). Defendant was served with notice of a hearing on Plaintiff's verified complaint on 2 June 2014. Plaintiff's verified complaint recounted Defendant's repeated attempts to contact her and stated, in part, that Plaintiff ended their relationship because Defendant "said and did controlling things" and that Plaintiff was "afraid" of him. Detective Wright also obtained a warrant to arrest Defendant for stalking on or around 5 June 2014 and arrested Defendant. After Defendant was released from jail, he again contacted Plaintiff and, in a voicemail, reportedly stated: "[Y]ou put me through hell. Now it's your turn."
A hearing on Plaintiff's verified complaint was held on 4 August 2014. Plaintiff testified she ended her relationship with Defendant because she was "very afraid" of him and that Defendant had called her twelve times, left six voicemail messages, and texted her ten times between 1 May 2014 and the day of the hearing, with most of those contacts occurring in May 2014. Plaintiff further testified that Defendant's continued contacts had "severely affected [her] new job that [she had] just [taken] when all this started happening. [She] had to leave work several times. It[ ] [has] caused [her] a lot of emotional distress. [She has had] trouble sleeping. It [gave her] an upset stomach. [She also] purposely avoid[ed] the Greenway [now.]"
In a DVPO entered 4 August 2014, the trial court concluded that Plaintiff and Defendant had been in a "dating relationship" and found that, after Plaintiff tried to end the relationship, Defendant "continued to initiate contact by telephone and [text] message for no legitimate purpose except to torment Plaintiff." The trial court further found that Defendant's conduct had caused Plaintiff to "suffer[ ] substantial emotional distress in that she suffers [from] anxiety, sleeplessness[,] and has altered her daily living activities." The trial court concluded that Defendant had "committed acts of domestic violence against" Plaintiff in that he "placed [Plaintiff] in fear of continued harassment that rises to such a level as to inflict substantial emotional distress." Defendant was ordered, inter alia, to have no contact with Plaintiff and to surrender his firearms for one year. Defendant appeals.
II. Standard of Review
When the trial court sits without a jury regarding a DVPO,
the standard of review on appeal is whether there was competent evidence to support the trial court's findings *239 of fact and whether its conclusions of law were proper in light of such facts. Where there is competent evidence to support the trial court's findings of fact, those findings are binding on appeal.
Hensey v. Hennessy, 201 N.C.App. 56, 59, 685 S.E.2d 541, 544 (2009) (citation omitted). "Questions of statutory interpretation are questions of law, which are reviewed de novo by an appellate court." State v. Largent, 197 N.C.App. 614, 617, 677 S.E.2d 514, 517 (2009) (citation omitted).
III. "Dating Relationship"
Defendant challenges the applicability of North Carolina's Domestic Violence Act ("the Act") to the facts in the present case. See generally N.C. Gen.Stat. § 50B-1 et seq. (2013). Specifically, Defendant contends the trial court erred by concluding that he and Plaintiff were in a "dating relationship" for the purposes of the Act, primarily because their relationship lasted for less than three weeks. We disagree.
N.C.G.S. § 50B-1 limits the definition of "domestic violence[,]" in relevant part, to the commission of certain acts "by a person with whom the aggrieved party has or has had a personal relationship[.]"
*903 For purposes of this section, the term "personal relationship" means a relationship wherein the parties involved:
...
(6) Are persons of the opposite sex who are in a dating relationship or have been in a dating relationship. For purposes of this subdivision, a dating relationship is one wherein the parties are romantically involved over time and on a continuous basis during the course of the relationship. A casual acquaintance or ordinary fraternization between persons in a business or social context is not a dating relationship.
N.C.G.S. § 50B-1(b). N.C.G.S. § 50B-1(b)(6) has rarely been interpreted by our appellate Courts. However, "[i]n interpreting a statute, we first look to the plain meaning of the statute. Where the language of a statute is clear, the courts must give the statute its plain meaning [.]" Frye Reg'l Med. Ctr. v. Hunt, 350 N.C. 39, 45, 510 S.E.2d 159, 163 (1999). "In the absence of a contextual definition, courts may look to dictionaries to determine the ordinary meaning of words within a statute."
*240 In re N.T., 214 N.C.App. 136, 141, 715 S.E.2d 183, 186 (2011) (citations and quotation marks omitted).
We first begin by examining what a "dating relationship" is not. Specifically, under N.C.G.S. § 50B-1(b)(6), a "casual acquaintance or ordinary fraternization between persons in a business or social context is not a dating relationship." The term "acquaintance" means "a relationship less intimate than friendship." Webster's II New College Dictionary 10 (3d ed.2005). The term "fraternize" means to "associate with others in a congenial or brotherly way." Id. at 453. Read together-and in conjunction with the modifiers "casual acquaintance" and "ordinary fraternization"-this language appears to expressly exclude only the least intimate of personal relationships from the definition of "dating relationship" in N.C.G.S. § 50B-1(b)(6). (emphasis added).
However, N.C.G.S. § 50B-1(b)(6) also provides that a "dating relationship" is one in which the parties are "romantically involved over time and on a continuous basis during the course of the relationship." (emphasis added). Provided that a relationship is not a "casual acquaintance" or results merely from "ordinary fraternization[,]" and provided that this relationship is "romantic" in nature "on a continuous basis" and for a sufficient period of time, then it would appear to constitute a "dating relationship" under N.C.G.S. § 50B-1(b)(6). The primary question this Court must resolve is how long a "continuous" "romantic" relationship must exist in order for it to exist "over time[.]"
As a preliminary matter, we do not believe that the term "over time" is unambiguous. Indeed, this Court has used "over time" to describe everything from the span of minutes or hours, see State v. Dahlquist, ---N.C.App. ----, ----, 752 S.E.2d 665, 668 (2013), disc. review denied, 367 N.C. 331, 755 S.E.2d 614 (2014), to months or years, see In re O.C., 171 N.C.App. 457, 464, 615 S.E.2d 391, 395 (2005). "[W]here the statute is ambiguous or unclear as to its meaning, the courts must interpret the statute to give effect to the legislative intent." Frye Reg'l Med. Ctr., 350 N.C. at 45, 510 S.E.2d at 163. If the statute also is "remedial" in nature, the "statute must be construed broadly in the light of the evils sought to be eliminated, the remedies intended to be applied, and the objective to be attained," O & M Indus. v. Smith Eng. Co., 360 N.C. 263, 268, 624 S.E.2d 345, 348 (2006) (emphasis added) (citation and quotation marks omitted), as well as to "bring[ ] within it all cases fairly falling within its intended scope." Burgess v. Brewing Co., 298 N.C. 520, 524, 259 S.E.2d 248, 251 (1979).
"A remedial statute ... is for the purpose of adjusting the rights of the parties as between themselves in respect to the wrong alleged."
*241 Martin & Loftis Clearing & Grading, Inc. v. Saieed Constr. Sys. Corp., 168 N.C.App. 542, 546, 608 S.E.2d 124, 127 (2005) (citation and quotation marks omitted). N.C. Gen.Stat. § 50B-3 (2013) defines the kinds of relief available to aggrieved parties under the Act. This section provides that "[i]f the [trial] court ... finds that an act of domestic violence has occurred, the court shall grant a protective order restraining the defendant from further acts of domestic violence" and it authorizes a litany of enumerated forms of relief in order to effectuate that end. See id. In essence, N.C.G.S. § 50B-3 "requires the state to engage in *904 prompt remedial action adverse to an individual['s] [property or liberty] interest [s]" in order to further "the legitimate state interest in immediately and effectively protecting victims of domestic violence[.]" Cf. State v. Poole, ---N.C.App. ----, ----, 745 S.E.2d 26, 37, disc. review denied, 367 N.C. 255, 749 S.E.2d 885 (2013) (emphasis added) (citation and quotation marks omitted) (discussing ex parte protective orders under N.C. Gen.Stat. §§ 50B-2(c) and 50B-3.1 (2013) ). Moreover, the term "over time" in N.C.G.S. § 50B-1(b)(6) is used to define the General Assembly's " intended scope [,]" Burgess, 298 N.C. at 524, 259 S.E.2d at 251, of who may obtain relief under N.C.G.S. § 50B-3. Therefore, to the extent that the term "over time" in N.C.G.S. § 50B-1(b)(6) is ambiguous, it will be " construed broadly" by this Court. See O & M Indus., 360 N.C. at 268, 624 S.E.2d at 348 ; Burgess, 298 N.C. at 524, 259 S.E.2d at 251.
As an additional matter of statutory construction, we also note that "the words and phrases of a statute must be interpreted contextually, in a manner which harmonizes with the other provisions of the statute and which gives effect to the reason and purpose of the statute." Burgess, 298 N.C. at 524, 259 S.E.2d at 251. Given that the last sentence in N.C.G.S. § 50B-1(b)(6), regarding "casual acquaintance[s]" and "ordinary fraternization [,]" appears to expressly exclude from the definition of "dating relationship" only the least intimate of personal relationships, we do not believe that the term "over time"-construed broadly-categorically precludes a short-term romantic relationship, such as the one in the present case, from ever being considered a "dating relationship" for the purpose of N.C.G.S. § 50B-1(b)(6). Instead, we agree with courts in other jurisdictions that the question of what constitutes the "minimum conduct to establish a dating relationship ... is necessarily fact sensitive and thus warrants a 'factor approach' rather than a 'definitional approach[.]' "[1]
*242 Andrews v. Rutherford, 363 N.J.Super. 252, 832 A.2d 379, 382-84, 387 (CH.DIV.2003) (noting that vermont, massachusetts, and washington also use a factor approach); accord Brand v. State, 960 So.2d 748, 750-52 (Ala.Crim.App.2006) (adopting the factor approach used in Andrews ).
The court in Andrews provided six non-exhaustive factors that courts should consider when determining if a "dating relationship" existed-factors we believe are informative in the present case:
1. Was there a minimal social interpersonal bonding of the parties over and above [that of] mere casual [acquaintances or ordinary] fraternization?
2. How long did the alleged dating activities continue prior to the acts of domestic violence alleged?
3. What were the nature and frequency of the parties' interactions?
4. What were the parties' ongoing expectations with respect to the relationship, either individually or jointly?
5. Did the parties demonstrate an affirmation of their relationship before others by statement or conduct?
6. Are there any other reasons unique to the case that support or detract from a finding that a "dating relationship" exists?
Andrews, 832 A.2d at 383-84.
In the present case, under the first factor in Andrews, the uncontested evidence shows that Plaintiff and Defendant dated each other for less than three weeks, which appears to exceed the "minimal social interpersonal bonding" of casual acquaintances or of contacts through ordinary fraternization. Under the second factor, Plaintiff testified that she ended her relationship with Defendant after less than three weeks because she was "very afraid" of Defendant and instructed Defendant to never contact her again, at which point Defendant began contacting Plaintiff repeatedly and over a prolonged period of time. There is little evidence in the record regarding the third, fourth, and fifth factors, but we do not believe that this is necessarily dispositive. As for the sixth factor, we find it notable that Defendant felt strongly enough about his relationship with *905 Plaintiff to extend their two-to-three-week-long relationship into essentially a two-to-three-month-long breakup by continuing to contact Plaintiff in direct contravention of Plaintiff's *243 and Detective Wright's demands that he cease.[2] After reviewing these factors, we believe there was sufficient competent evidence to establish that the relationship between Plaintiff and Defendant fit within the General Assembly's intended definition of "dating relationship" and we find no error by the trial court.
IV. Fear of Continued Harassment
Defendant contends there was insufficient evidence for the trial court to find that Defendant "placed [Plaintiff] in fear of continued harassment that rises to such a level as to inflict substantial emotional distress." See N.C. Gen.Stat. § 50B-1(a)(2) (2013). Specifically, Defendant argues that, "[e]xcept for one voicemail that Defendant left after he was arrested, Plaintiff failed to present evidence as to the nature of [Defendant's] voicemails or texts, thereby failing to show Defendant's intent was to harass Plaintiff."
As a preliminary matter, "[t]he plain language of [N.C.G.S. § ] 50B-1(a)(2) imposes only a subjective test, rather than an objective reasonableness test, to determine whether an act of domestic violence has occurred." Brandon v. Brandon, 132 N.C.App. 646, 654, 513 S.E.2d 589, 595 (1999). Therefore, N.C.G.S. § 50B-1 does not require Plaintiff to establish that Defendant "intended" to do anything. Instead,
[d]omestic violence means the commission of one or more of the following acts upon an aggrieved party ... by a person with whom the aggrieved party has or has had a personal relationship ...:
...
(2) Placing the aggrieved party ... in fear of ... continued harassment, as defined in G.S. 14-277.3A, that rises to such a level as to inflict substantial emotional distress[.]
N.C.G.S. § 50B-1(a) (emphasis added). N.C. Gen.Stat. § 14-277.3A (2013) provides that "harassment" is
[k]nowing conduct, including written or printed communication or transmission, telephone, cellular, or other wireless telephonic communication, facsimile transmission, pager messages or transmissions, answering machine or *244 voice mail messages or transmissions, and electronic mail messages or other computerized or electronic transmissions directed at a specific person that torments, terrorizes, or terrifies that person and that serves no legitimate purpose.
The evidence presented at the hearing tended to show that (1) Plaintiff and Defendant entered into a romantic relationship; (2) within several weeks, Plaintiff ended the relationship, reportedly because she was "very afraid" of Defendant, and she expressly instructed Defendant to not contact her again; (3) Defendant nevertheless proceeded to contact Plaintiff repeatedly and over a prolonged period of time, even after Plaintiff filed a domestic violence complaint against him and Detective Wright directed him to stop contacting Plaintiff; (4) after Defendant was arrested for continuing to contact Plaintiff, he left a voicemail on Plaintiff's phone and stated: "[Y]ou put me through hell. Now it's your turn[;]" and (5) Plaintiff consequently suffered from anxiety and sleeplessness and altered her daily living activities. Although Plaintiff testified only about the specific contents of one voicemail during the hearing-which Defendant acknowledges was "hostile" in nature-when combined with the facts described above, there was sufficient competent evidence for the trial court to find that Defendant placed Plaintiff in fear of continued harassment and caused her substantial emotional distress, and this finding supports the trial court's ultimate conclusion that Defendant committed acts of domestic violence against Plaintiff. See N.C.G.S. § 50B-1(a)(2). Defendant's argument is without merit.
AFFIRMED.
Judges GEER and TYSON concur.

For similar reasons, to the extent that there may be ambiguities in determining whether a relationship was sufficiently "romantic" in nature or "continuous" for the purposes of N.C.G.S. § 50B-1(b)(6), we believe these ambiguities are also appropriately addressed through a factor approach.

Defendant even suggests in his brief before this Court that these repeated, unwelcome attempts to contact Plaintiff were done "with the hopes of continuing the [parties'] 'relationship.' "